SCOTT *v.* SEVENTY-FIVE TONS OF PIG-IRON.

*(District Court, D. Connecticut.* March 9, 1885.)

**1. SALVAGE—REPLEVIN OF SALVED PROPERTY BY OWNERS—LIBEL TO ENFORCE LIEN—JURISDICTION.**

When a cargo of iron, on board a vessel that has been pumped out and brought into her port of destination by salvors, has been replevied by the owners in a state court, for the express purpose of melting it up and putting it beyond the reach of any court, and the control of the state court over it was a fiction, the district court of the United States will have jurisdiction of a libel to enforce the lien of the salvors, and the iron may be seized by the marshal under monition issued by the court.

**2. SAME—AMOUNT OF AWARD.**

The services rendered in this case considered, and the sum of $350 allowed to libelants as compensation, with costs.

In Admiralty.

*Samuel Park,* for libelant.

*Arthur B. Calef* and *Samuel L. Warner,* for claimants.

SHIPMAN, J. This is a libel *in rem* for salvage. On October 21, 1884, the schooner Emily, a vessel about 32 years old and then worth, with her appurtenances, about $400, left Perth Amboy with a load of 120 tons of pig-iron, of which 75 tons were consigned to the claimants, the Stiles & Parker Press Company, of Middletown, in this district. Herbert S. Goodale was the captain of the schooner and owned three-fourths of her. One other man constituted the crew. There was no insurance upon her. She went through Hell Gate on October 23d, and on October 25th went down the sound with a north-west wind and strong breeze. Near Shippan Point the foremast, which was an old article, cracked or broke. The mainsail was torn and carried away by the wind. The vessel commenced to leak badly, and the captain ran her into Norwalk harbor, about three-fourths of a mile from the sound, and beached her in a safe and land-locked place, and upon a soft bottom. She filled with water. At high tide she was seven feet under water. At low tide the deck was out of water.

The captain could not find assistance to get his boat or cargo off, and on Sunday, October 26th, telegraphed to the libelant that the schooner was sunk off Norwalk harbor and asked for assistance. The libelant is well known throughout the sound to be engaged in the business of saving wrecked vessels and cargoes, and owns at least two vessels equipped with all the appliances needful for said business, constantly manned and in readiness. The master and crew were not guilty of fraud and had no motive to commit fraud, either in beaching the vessel or in sending for the libelant, and there was no collusion between him and the captain or the crew. The libelant sent on the morning of October 27th, the schooner Report and steam-tug Alert, Capt. Chesebro in command, with six men on board of each vessel, to the assistance of the Emily. The boats reached the wreck

on the evening of the same day, and found her under water, her foremast broken and mainsail and jib torn. Capt. Chesebro made a contract that evening with Capt. Goodale, by which the libelant was to receive 50 per cent. of the value of the saved property delivered at its destination. On the next day, at low water, the schooner was pumped out in three or four hours' time, and was pumped out twice during the night of that day. The 30th and 31st were stormy and the schooner was kept pumped out. On the 31st the only apparent leak in the vessel, about a foot long in the "tuck seam," was found and was temporarily stopped. On November 2d, the libelant's boats, with the Emily, left Norwalk harbor and stopped about 20 hours in the sound, five or six miles from Norwalk, to take some iron out of another sunken vessel, the Marietta. The contract for this service was made by the libelant in New York after the 26th. While this service was being performed, the Emily lay about 400 yards from the Marietta. The Emily was then towed to Bridgeport and 25 tons of iron were delivered to the owners, and then was towed to Middletown. The libelant demanded salvage upon the 75 tons from the claimants, who refused to pay, and brought a writ of replevin for said iron before the superior court for Middlesex county, upon which writ the iron was seized by the sheriff and delivered to the claimants, was put in their store-house, and was immediately put by them into the furnace, in their ordinary business, at the rate of one or two tons per day. The replevin suit was brought to enable the claimants to obtain and to use up the iron promptly. They did not intend that it should be kept in the possession of anybody. The statutory bond was given for the return of the property to the defendants if the plaintiffs failed to establish their right to the possession of the same. The libelant and Capt. Goodale were made defendants.

The libelant subsequently libeled the iron which was not melted, and which was in the claimants' exclusive possession, and possession thereof was taken by the marshal. After the trial of this case, the claimants gave to the marshal a delivery bond, conditioned to be void if they performed the decree of the court in the matter of the libel, and the iron was delivered to them. The value of the iron was $1,515. The libelant's two vessels and appurtenances, which went to Norwalk, are worth $16,000.

The first question relates to the jurisdiction of this court, and arises upon the principle which has been often asserted in the decisions of the supreme court, and which is stated in *Buck* v. *Colbath*, 3 Wall. 334, as follows:

"That principle is that whenever property has been seized by an officer of the court, by virtue of its process, the property is to be considered as in the custody of the court and under its control for the time being; and that no other court has a right to interfere with that possession, unless it be some court which may have a direct supervisory control over the court whose process has first taken possession, or of some superior jurisdiction in the premises. * * * This principle, however, has its limitations, or rather its just

definition is to be attended to. It is only while the property is in the possession of the court, either actually or constructively, that the court is bound or professes to protect that possession from the process of other courts. Whenever the litigation is ended, or the possession of the officer or court is discharged, other courts are at liberty to deal with it according to the rights of the parties before them, whether those rights require them to take possession of the property or not."

If the property was either actually or constructively in the custody of the state court at the time of the service of the monition, no valid seizure of it could be made by the marshal, and this court would have no jurisdiction of this libel. The mere fact that it was in the possession of the claimants would not prevent its being in the custody of the law, and if it was in their hands awaiting the decision of the state court, and in readiness, upon its judgment of return, to be delivered to the defendants in the replevin suit, it would have been incumbent upon the libelant to wait until such an order had been made and the litigation was at an end. But it is idle to say that the iron was in the custody of the law, when the purpose and the effect of the replevin suit were to remove it from the custody of any court, and to prevent it from being subject to any order, and when the object of putting legal machinery in motion was to enable the plaintiffs to effectually preclude its return to the defendants. It is a misuse of terms to say that the iron was in the possession or control of the state court, and it would be an abuse of the authority of that court if such a fiction as its pretended custody of this property should be made to prevent the exercise over it of the ordinary jurisdiction of another court.

The claimants next insist that this court has no jurisdiction because the state court can determine, in the replevin suit, the questions of the existence and the extent of the libelant's lien, and they rely upon the following language of the supreme court in *Freeman* v. *Howe*, 24 How. 450:

"Where a court has jurisdiction it has a right to settle every question which occurs in the case, * * * and that where the jurisdiction of a court and the right of a plaintiff to prosecute his suit in it have once attached, that right cannot be arrested or taken away by proceedings in another court."

Without stopping to inquire whether the state court could properly determine the amount of the libelant's lien upon the iron, this language is clearly explained in *Buck* v. *Colbath*, where the court says:

"It is not true that a court, having obtained jurisdiction of a subject-matter of a suit, and of parties before it, thereby excludes all other courts from the right to adjudicate upon other matters having a very close connection with those before the first court, and, in some instances, requiring the decision of the same questions exactly. In examining into the exclusive character of the jurisdiction of such cases, we must have regard to the nature of the remedies, the character of the relief sought, and the identity of the parties in the different suits."

If the iron was in such a condition that it could rightfully be made the subject of a libel *in rem*, the libelant was not excluded from obtaining the judgment of an admiralty court upon the question of a

maritime lien, by reason of the fact that a state court, perhaps, might in another proceeding ascertain the amount which was due him, because the relief which he seeks in admiralty is very different from the relief which he could obtain in a state court.

The existence and the amount of the lien are next to be ascertained. That the Emily and her cargo were in distress and needed help are certain, and it is unavailing to say that she ought not to have been in distress. I think that the trouble happened because the schooner was very old, and, with a heavy cargo, was unable to withstand much of a strain, and, moreover, she was insufficiently manned. The libelant, whose business it is to save vessels in distress, was telegraphed to go to her aid, without any previous knowledge that his services were or would be wanted, and in response he sent his vessels amply equipped. They found the vessel in a safe land-locked place, on the mud, in the bottom of Norwalk harbor, but she could not be got away without skilled and energetic and expensive assistance.

The contract which the captain of the Emily entered into was an improvident one, so far as the cargo is concerned, in view of the ease with which the libelant could furnish assistance and the lack of immediate peril to the cargo. The rate is too large, under the circumstances of the case, to receive the sanction of the court.

The facts which bear upon the amount of compensation are that the assistance of a skilled man, whose property consists of vessels equipped and manned for saving cargoes, and whose business it is to render dangerous, laborious, and expensive services, was sought; that he sent a sailing vessel, a steam-tug, and 12 men, to aid the schooner and cargo; that the situation of the submerged vessel, though it needed assistance, was not immediately perilous; that the work of raising the vessel by the aid of the libelant's steam-pumps was easy; and that there was no danger to his crews or his property. It is not a case which calls for very large compensation, but the libelant should receive a liberal amount when he is honestly engaged in this uncertain and expensive business.

The sum of $350 is allowed, with costs.